**Michael WOLLINS, Plaintiff,**

v.

**Abe ANTMAN and Sandra Antman, Defendants.**

No. 84 CV 4709.

United States District Court, E.D. New York.

June 30, 1986.

---

Messite & Davidson, P.C., New York City by Hy Davidson and Vivian Shevitz, for plaintiff.

Rosenthal & Curry by John E. Curry, East Meadow, N.Y., for defendants.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This securities fraud action arises out of the sale of all the capital stock of Twentieth Century Cosmetics, Inc. ("Twentieth Century"), a small cosmetics company. Plaintiff, who purchased the stock in August 1984, claims that, in connection with the sale, defendants made several material misrepresentations and omissions of fact in violation of the federal and state securities

laws and the common law. The case was tried before me without a jury.

### Background

The following facts are undisputed:

Twentieth Century is a New York corporation located in Brooklyn, New York. It is principally engaged in the manufacture and packaging of cosmetics and toiletries. Prior to August 1984, defendants Abe and Sandra Antman, husband and wife, each owned 50% of the corporation's stock and were its sole officers and directors.

In recent years, Twentieth Century had achieved a level of gross sales of approximately $200,000–$300,000 annually. A large portion of this business was attributable to one account—Gardner Marketing Corporation ("Gardner")—for which Twentieth Century packaged a product known as "Mona Nails." In October 1983, however, Gardner ceased doing business with Twentieth Century. Thereafter, Twentieth Century experienced a substantial decline in sales.

Sometime thereafter, defendants decided to sell the business and retire to Florida. Accordingly, on June 24, 1984, they placed an advertisement in the *New York Times*, indicating that the business was for sale. The plaintiff, Michael Wollins, who had no prior experience in the cosmetics business, responded to the advertisement.

In the ensuing weeks, plaintiff and defendants engaged in several conversations—both in person and by telephone. Plaintiff visited the premises of Twentieth Century on at least two occasions. On one of these visits, plaintiff was accompanied by his accountant. The nature and degree of the representations made by defendants during this period form the basis of this lawsuit.

In any event, on July 24, 1984, the parties signed a contract wherein plaintiff agreed to purchase 100% of the Twentieth Century stock from defendants for the sum of $90,000.00. *See* Plaintiff's Ex. 5. The parties closed the deal on August 15, 1984.

Shortly thereafter, plaintiff demanded rescission. Upon defendants' refusal to rescind the agreement, this action ensued.

### The Dispute

Plaintiff contends that in connection with the stock sale, defendants made several material misrepresentations and omissions with respect to the viability of the company and the nature and effect of the Gardner departure. Specifically, plaintiff alleges that defendants misrepresented the following: (a) that the Gardner account was "given up," when, in fact, it was "lost"; (b) that this account constituted only about 10–15% of the corporation's gross sales, when, in fact, it comprised nearly 70% of the business; and (c) that the lost business had been "more than" replaced by several smaller accounts, when, in fact, only a small fraction of the business had been replaced.

Plaintiff does not allege that the tax returns and records he was shown were inaccurate or fraudulent. Rather, he contends that his accountant was denied access to many of defendants' books and records. In particular, plaintiff and his accountant assert that they were never shown the defendants' "cash book," which, concededly, would have instantly revealed the precise impact of the loss of the Gardner account.

Plaintiff's version of the facts is, for the most part, supported by the testimony of his accountant and his lawyer, and to some extent by the accounts of two disinterested individuals who had also visited defendants' premises as prospective purchasers, and to whom defendants allegedly made similar representations.[1] Not surprisingly, however, defendants and their accountant provided a dramatically different version of the parties' discussions.

---

1. In addition to the above-mentioned witnesses, plaintiff called Randolph Hendrix, a former Twentieth Century employee, who provided a revealing account of the day-to-day operations of the business.

Defendants contend that they informed plaintiff of the circumstances surrounding the loss of the Gardner account; that they described Gardner as a "major" or "large" account, and that they never said the lost business had been replaced. More importantly, defendants contend that they provided plaintiff with access to all their books and records, and that plaintiff's accountant actually reviewed these records, including the cash book, on two occasions—during his visit to the corporation and later at the closing. Thus, defendants argue that plaintiff was fully aware of all relevant facts at the time of purchase.

Put simply, the Court is confronted with a classic question of credibility. Plaintiff has devoted much effort—both at trial and in his post-trial submissions—to attacking defendants' credibility. In particular, plaintiff points to several alleged inaccuracies or inconsistencies in Mrs. Antman's testimony. *See e.g.*, Plaintiff's Letter Dated April 30, 1986.

The Court has given much consideration to plaintiff's arguments. Nonetheless, having had the opportunity—at the trial and at the post-trial hearing—to hear the testimony of all the witnesses and to observe their demeanor while on the stand, and having considered all the evidence—including the testimony of the two disinterested individuals—this Court now resolves all issues of credibility in favor of the defendants.

Accordingly, the following constitute the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52.

### Findings of Fact

Plaintiff first contacted the defendants by telephone in late June 1984. During this initial conversation, Mrs. Antman brushed him off because of his lack of experience in the cosmetics business. Apparently, however, when plaintiff called again a few days later, defendants began to take him seriously. Mrs. Antman testi-

fied that she did not remember whether the first conversation regarding the sales and gross profit of the company took place during this conversation, or during plaintiff's initial visit to the premises a few days later.

In any event, it is clear that in one of these early conversations, plaintiff was told that in the last few years, the business had registered gross sales in excess of $200,-000, and had yielded a net profit of approximately $100,000 annually. Moreover, during plaintiff's first visit to the premises, Mrs. Antman advised plaintiff that the gross sales for the most recent fiscal year ending May 1984 were approximately $200,000. Mrs. Antman cautioned plaintiff, however, that the latter figure included a "large major account which [they] no longer had." Tr. at 152. Mrs. Antman identified this account as the Gardner Marketing or Mona Nails account. Mrs. Antman also advised plaintiff that the business was "currently" doing approximately $9,000–10,000 in gross sales per month.[2]

For the most part, however, this initial meeting merely focused upon orienting plaintiff to the operations of the business. Plaintiff concedes that he toured the premises and observed the dilapidated condition of the equipment. Mr. Antman showed plaintiff the type of work done at Twentieth Century, and Mrs. Antman informed him of the company's general buying and pricing procedures.

A few days later, plaintiff returned to Twentieth Century with his accountant. The accountant, who spent approximately three to four hours on the premises, was shown the general ledger (which was posted through March 1984), the cash book (which was current, and revealed the names of defendants' accounts) and certain tax returns and invoices. Tr. at 153–56; 199. During their discussions with plaintiff's accountant, the Antmans indicated that they no longer had a major account—

2. A review of the cash book and the general ledger reveals that from October 1983 (when Gardner withdrew its business) to August 1984, the business, in fact averaged approximately $9,100 in gross sales per month.

Gardner Marketing—which had left the company in October 1983 after defendants advised Gardner that they could not lower their prices.

Mrs. Antman advised plaintiff's accountant, as she previously had advised plaintiff, that the $200,000 gross sales figure for the most recent fiscal year, which ended in May 1984, included the Gardner account. Mrs. Antman concedes that she did not state precisely what percentage of Twentieth Century's total sales was attributable to the Gardner Marketing account (indeed, she admits that she does not know the percentage). Nonetheless, I find that the Antmans provided plaintiff's accountant with the books and records from which this information readily could have been determined.[3]

Finally, although the Antmans advised plaintiff and his accountant that the company had recently secured some new business—including the seemingly promising West Cabot account[4]—they did not at any time represent that the volume of sales lost from the Gardner account had been fully replaced.

On July 24, 1984, the parties met at defendants' attorney's office and executed a contract. *See* Plaintiff's Ex. 5. The contract states that the defendants agreed to sell all of the outstanding stock of the company to the plaintiff at a purchase price of $90,000. In addition to some fairly standard representations and warranties, and a requirement that Mr. Antman remain as an uncompensated employee of the corporation for one month after the sale, the contract provided that all corporate books and tax returns be supplied at the closing.[5]

The closing was held on August 15, 1984. Defendants brought to the closing the tax returns for the fiscal year ending May 1984, together with all books and records (including the cash book).[6]

Upon reviewing the cash book at the closing, plaintiff's accountant inquired whether an account had been lost. Defend-

---

**3.** The cash book, which lists the amount of each sale and the identity of the customer, accurately revealed no sales to Gardner after October 1983. Likewise, the general ledger, which at that time was posted through March 1984, revealed a sharp decline in total sales for the months following October 1983. Hence, a quick perusal of the cash book and the general ledger would have revealed the percentage of Twentieth Century's business which the Gardner account comprised, and the overall impact of the loss of that account on the company's sales and earnings prospects.

**4.** At trial, it was revealed that West Cabot cancelled its remaining orders with Twentieth Century approximately one month after the sale. Nothing in the record suggests, however, that defendants knew or could have known of this occurrence. In fact, there is some indication that West Cabot withdrew because it perceived that plaintiff was not devoting enough attention to the account.

**5.** The original draft of the contract, which was prepared by defendants' attorney, contained a clause which provided that all books and records would be made available for plaintiff's review during the period prior to the closing. This paragraph was crossed out prior to the signing of the contract. *See* Plaintiff's Ex. 5. The paragraph was replaced by a handwritten rider indicating that the books and records would be supplied at the closing.

Plaintiff argues that this deleted paragraph constitutes compelling evidence that he was denied access to defendants' books and records prior to the closing. At the post-trial hearing, however, Mrs. Antman testified that the paragraph was deleted since plaintiff and his accountant had already reviewed the books and records on their prior visit, and since the records were to be made available still another time at the closing. The Court accepts defendants' explanation.

**6.** At trial, to bolster their testimony that the cash book was brought to the closing, defendants testified that everyone at the closing was amused as Mrs. Antman made one final, ceremonial entry in the book. In his post-trial submission, however, plaintiff pointed out that no such entry appears in the cash book. Then, plaintiff moved to re-open the trial for the purpose of admitting the cash book. This motion was granted on March 13, 1986.

At the post-trial hearing, Mrs. Antman explained that she had made a copy of the cash book for her own personal records, and that, upon reflection, the entry previously referred to was made on the copy. *See* Defendants' Ex. AA. Again, having considered all the evidence and having observed the manner and demeanor of all the witnesses who testified, the Court credits defendants' explanation, and finds that the cash book was brought to the closing and made available to the plaintiff.

ants were startled by this inquiry, since he had already been given all the details regarding the departure of the Gardner account. Nonetheless, they again advised the plaintiff that a major account had left Twentieth Century in October 1983. After plaintiff, his lawyer and his accountant caucused in the hall for approximately one hour, plaintiff's accountant asked defendants if they could guarantee that all the lost business had been replaced. Defendants answered that, while they had acquired some new accounts, they had not replaced the sales volume lost after Gardner's departure. Defendants again represented that the business was operating at a level of roughly $10,000 gross sales per month.

Apparently satisfied by this explanation, plaintiff agreed to close the deal. Upon consent of plaintiff's accountant, defendants' accountant left the closing with the cash book to enable him to complete his accounting functions. The cash book was then forwarded to plaintiff approximately one month after the closing.

### Conclusions of Law
#### Securities Claims

■ Since the sale of Twentieth Century was structured as a sale of the capital stock of the corporation, it clearly constitutes a securities transaction within the ambit of the anti-fraud provisions of the federal securities laws. *See Landreth Timber Company v. Landreth,* — U.S. ——, 105 S.Ct. 2297, 2308, 85 L.Ed.2d 692 (1985); *Golden v. Garafalo,* 678 F.2d 1139, 1140, 1144 (2d Cir.1982). Accordingly, plaintiff alleges violations of Section 12(2) and 17(a) of the Securities Act of 1933, and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. In addition, plaintiff raises a state law claim of securities fraud in violation of Article 23a of the General Business Law of the State of New York (the "Martin Act").

**7.** As the Supreme Court has noted, "[S]ection 10b–5 is aptly described as a catchall provision, but what it catches must be fraud." *Chiarella v.*

Although the elements of the various claims differ in certain respects, each claim requires proof of a material misrepresentation or omission of fact.[7] Because I find that all the information provided to plaintiff was true and accurate, and hence, that defendants made no misrepresentations of fact, the balance of this opinion will address the question whether defendants breached their duty of disclosure by omitting a material fact, *i.e.,* the percentage of total sales represented by the Gardner account. *See Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980).

■ An omitted fact is material if there is a substantial likelihood that a reasonable person would consider it important in determining his choice of action. *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Klausner v. Ferro,* 604 F.Supp. 1188, 1194 (E.D.N.Y.1985). As the Supreme Court noted in *TSC Industries,* the standard of materiality contemplates:

> a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly altered the "total mix" of information made available.*

*TSC Industries, supra,* 426 U.S. at 449, 96 S.Ct. at 2132 (emphasis added).

■ In this case, defendants disclosed the fact that the previous year's gross sales figure included an account which had stopped doing business with Twentieth Century. The defendants identified this account by name, and described it as either a "large" or "major" account. Additionally, defendants disclosed the circumstances surrounding the account's departure.

*United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980).

Likewise, defendants informed plaintiff of the approximate monthly sales figure being achieved by the business since the departure of the Gardner account. Finally, they permitted plaintiff's accountant to review the general ledger and the cash book. The former provided verification of the monthly gross sales figures for the period from May 1983 through March 1984, and hence, revealed the extent of the decline in monthly sales for the first four to five months after the loss of the Gardner account (October 1983). More importantly, the cash book revealed an up-to-the-minute account of the firm's operations, identifying each sale by customer name and amount, and hence, providing plaintiff with the information necessary to calculate the percentage of Twentieth Century's sales attributable to any one customer.

■ This is not a case where the purchaser's access to the desired information would have required voluminous and meticulous research. *Cf. Metro Goldwyn-Mayer, Inc. v. Ross*, 509 F.2d 930, 933 (2d Cir.1975). Nor is this a case where the purchaser could not have known that a specific item of information had been omitted. Clearly, upon being advised that the business had lost a "large major" account, plaintiff was aware that defendant had not elaborated on just how large the account was.[8]

Thus, in view of the information that was disclosed to plaintiff, this Court finds that a reasonable investor would not have found defendants' specification of the size of the Gardner account "as having significantly altered the 'total mix' of information made available." *TSC Industries, supra*, 426 U.S. at 449, 453, 96 S.Ct. at 2134. In short, this Court finds that defendants did not omit to state any material facts. *See Resort Car Rental Systems, Inc. v. Chuck Ruwart Chevrolet, Inc.*, 519 F.2d 317, 321 (10th Cir.1975); *Staffin v. Greenberg*, 509 F.Supp. 825, 835–37 (E.D.Pa.1981) *aff'd*, 672 F.2d 1196, 1205 (3d Cir.1982); *Klam-*

*berg v. Roth*, 473 F.Supp. 544, 551–52 (S.D.N.Y.1979).

Even assuming that defendants' failure to indicate the precise amount of business attributable to Gardner constituted a material omission of fact, however, plaintiff's securities claims cannot succeed. Plaintiff's claims under § 10 and § 17 and Rule 10b–5 of the federal securities laws and Article 23–A of the state blue-sky laws require a showing that plaintiff's reliance on defendants' actions caused him injury. *See, e.g., Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 313, 315–16 (2d Cir.1985); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985); *McDaniel v. Compania Minera Mar de Cortes*, 528 F.Supp. 152, 166 (D.Ariz.1981); *Eriksson v. Galvin*, 484 F.Supp. 1108, 1128 (S.D.N.Y.1980).

■ Concededly, in a case such as this involving allegations of non-disclosure, the element of reliance (or causation in fact) generally is presumed where plaintiff proves the withholding of a material fact in the face of an obligation to disclose. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). Defendants may rebut this presumption of reliance, however, by demonstrating that plaintiff had access to and knowledge of the omitted information, and therefore, that the alleged omission did not cause the injury suffered. *Fisher v. Plessey Company Limited*, 103 F.R.D. 150, 156 (S.D.N.Y.1984).

■ On the facts of this case, I find that defendants have successfully rebutted any presumption that defendants' omissions caused plaintiff's injuries. The conclusion is inescapable that plaintiff had full access to and knowledge of the information in question. There is simply no basis on this record for concluding that any further statements regarding the size of the Gardner account would have caused plaintiff to act differently. *See List v. Fashion Park, Inc.*, 340 F.2d 457, 463–64 (2d Cir.1965);

---

**8.** Indeed, the fact that plaintiff knew of the omission is fatal to his § 12(2) claim. *See Wi-*

*gand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1034 (2d Cir.1980).

*Jackson v. Oppenheim,* 411 F.Supp. 659, 668 (S.D.N.Y.1974), *aff'd in part, reversed in part on other grounds,* 533 F.2d 826, 830 n. 9 (2d Cir.1976).

■ Finally, plaintiff has failed to establish the element of scienter, *i.e.,* defendant's willful or reckless disregard for the truth, as required by Rule 10b–5 and § 17. *See Jackson v. Oppenheim, supra,* 411 F.Supp. at 665. This Court is convinced that defendants made a good faith effort to disclose all material information with respect to the loss of the Gardner account and the state of the business at the time of the parties' negotiations.

Obviously dissatisfied with his purchase of Twentieth Century, plaintiff asserts that the business is, in fact, worth less than the $90,000 he paid for it. While sympathetic to plaintiff's predicament, the Court is reminded of the Supreme Court's admonition that "once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the [securities laws]." *Santa Fe Industries v. Green,* 430 U.S. 462, 478, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977). Upon the facts of this case, the Court finds that plaintiff's federal and state securities claims must be denied.

*Common Law Claims*

■ In addition to his securities law claims, plaintiff has raised the common-law claims of breach of express and implied warranties and failure of consideration. Clearly, plaintiff's claim of failure of consideration is not a proper subject for judicial scrutiny, since defendants fully disclosed all material facts regarding the business at or before the date of the closing, and hence, the consideration received by the plaintiff was as represented by the defendants. *See Spaulding v. Benenati,* 57 N.Y.2d 418, 423, 442 N.E.2d 1244, 456 N.Y.S.2d 733, 735 (1982).

Likewise, there is no indication that defendants breached any of the warranties expressed in the contract, or otherwise took action which could be construed as a breach of their implied covenant of good faith and fair dealing. *See Kirke LaShelle*

*Co. v. Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163 (1933). Hence, plaintiff's common law claims are denied.

Accordingly, the Clerk is directed to enter judgment for the defendants.

SO ORDERED.